**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IB-RAHIM,<br><br>Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETRO-LEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CAL-UMET PARK MOBIL, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>Defendants. | Adv. No. _____<br><br>Hon. Jacqueline P. Cox |

## <u>COMPLAINT</u>

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), states as follows for his complaint against Sawsan Homsi ("Homsi"), Badr Ali ("Badr Ali"),[1] Petroleum Investment Properties, LLC ("PIP"), Calumet Fuel, Inc. ("Calumet Fuel"), Nasr Ali ("Nasr Ali"), Calumet Park Mobil, LLC ("Calumet Mobil"), Ahmad Zahdan ("Zahdan"), AJ 119th, Inc. ("AJ 119th"), and Ajomon Joy ("Joy").

---

[1] Plaintiff means no disrespect to Defendants Badr Ali and Nasr Ali by using their first names. Plaintiff does so merely to distinguish between the two defendants.

## I.    Introduction

1.    The Debtor owned a gas station and connected retail space located on the real property at 11900 Marshfield Avenue in Calumet Park, Illinois (the "Property").

2.    By 2016, however, it was apparent to the Debtor that he faced significant liabilities in connection with a loan made to the Debtor by Theodore Spyropoulos ("Spyropoulos"). Spyropoulos had died in 2014, but his trust (the "Trust"), which had acquired the promissory note related to the loan, was pressing its claim.

3.    In response to the Trust's collection efforts, the Debtor split ownership and control over the gas station between two entities. In December 2016, the Debtor formed 11900 Marshfield Station Inc. (the "OpCo"), to conduct the business at that location. This complaint will refer to all operations generating revenue at the Property as the "Business." At formation, the Debtor owned 100% of the OpCo. Separately, in December 2016, the Debtor formed the 11900 Marshfield LLC (the "PropCo") to take title to the Property. The OpCo and the PropCo were alter egos of the Debtor.

4.    In 2017, the Spyropoulos Trust filed a suit on the promissory note in state court.

5.    In April 2019, the Illinois Gaming Board issued Video Gaming Establishment License 181002758 (the "Gaming License") to the OpCo. This license entitles the gas station to conduct gambling operations and now produces $400,000-$500,000 in *profit* annually (apart from other business revenues generated at the gas station). The Illinois Gaming Board views a gaming license as running with the associated property. The Business included revenues from activities conducted under the Gaming License.

6.    In November and December 2019, the note case went to trial. On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor for $11,082,995.50.

7.      In anticipation of and in response to the judgment, the Debtor fraudulently transferred the OpCo's stock, the Business, and the Property to other Defendants. As a result, the Debtor transferred millions of dollars of assets in fraud of his creditors. The recipients of these transfers, in turn, fraudulently transferred the assets to still other Defendants. The Trustee seeks, in the alternative, to have these assets declared to be assets of the Estate or to avoid these transfers and subsequent transfers or recover the value of the assets (believed to more than $5 million). The chain of transfers for the OpCo, the Business, and the Property are described herein.

## II.     Parties and other relevant persons and entities

8.      The Debtor is a resident of the Northern District of Illinois. He filed the chapter 7 case identified in the caption on May 28, 2023.

9.      The OpCo is an Illinois corporation. It was dissolved but has been reinstated. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent is John Mraibe, 14497 John Humphrey Drive, Suite 200, Orland Park, Illinois, 60462-2632.

10.     The PropCo is an Illinois LLC. It was involuntarily dissolved on June 14, 2024. Its principal place of business was 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent at dissolution was the Debtor.

11.     Defendant Homsi is the Debtor's wife and a resident of the Northern District of Illinois.

12.     Defendant Badr Ali is a resident of the Northern District of Illinois.

13.     Defendant PIP is an Illinois LLC. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is PIP's registered agent.

14.     Defendant Calumet Fuel is an Illinois corporation. Its principal place of business is

11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is Calumet Fuel's registered agent.

15.    Defendant Nasr Ali is a resident of the Northern District of Illinois. He has been involved in multiple businesses owned, operated, or controlled by the Debtor.

16.    "Syed" is Iftekhar Syed, a confederate and longtime employee of the Debtor and his companies.

17.    Defendant Calumet Mobil is a Nevada corporation, whose principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Zadan.

18.    Defendant Zahdan is a resident of the Northern District of Illinois. On information and belief, he owns Defendant Calumet Mobil.

19.    Defendant AJ 119th is a tenant of Defendant Calumet Mobil. It now conducts the business operations at the Property. It has applied for a gaming license.

20.    Defendant Joy, on information and belief, is the owner of Defendant AJ 119th.

21.    The Spyropoulos Trust is the Debtor's largest creditor.

22.    Spyropoulos is the settlor of the Spyropoulos Trust.

### III.    Jurisdiction and venue

23.     The Court has subject-matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is being heard by the Court pursuant to 28 U.S.C. § 157(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

24.    This is a core proceeding under 28 U.S.C. § 157(b)(2).

25.    If proceedings to avoid and recover fraudulent transfers are found to be core proceedings in which the Bankruptcy Court is unable to constitutionally enter final orders due to the holding in *Stern v Marshall*, 564 U.S. 462 (2011), this matter may be heard by the Bankruptcy

Court under 28 U.S.C. § 157(c). *See Exec. Benefits Ins. Agency, Inc. v. Arkinson*, 573 U.S. 25 (2014).

26.     The Trustee consents to the entry of a final order by this Court.

27.     Pursuant to 28 U.S.C. §§ 1408 & 1409, this district is the proper venue for this adversary proceeding. The events from which this case arises occurred in the Northern District of Illinois.

IV.     **Facts applicable to all counts**

    A.  **Spyropoulos loaned the Debtor millions, which the Debtor failed to repay.**

28.     On January 15, 2010, Spyropoulos loaned the debtor $5,170,299, evidenced by a demand note with 8% annual interest. The note required payment within 30 days of demand on pain of default. The note had a default rate of 10%.

29.     In September 2014, Spyropoulos died.

30.     In or about November 2014, the Spyropoulos Trust demanded performance on the note.

31.     The Debtor defaulted and did not pay within 30 days of demand.

32.     Later, the Spyropoulos Trust continued to demand payment and sought to collect on the note.

    B.  **The Debtor owned a gas station operated on the Property and conveyed the Business and the Property to two alter ego entities, the OpCo and the PropCo.**

33.     As of 2016, the Property was owned by an entity called AHM Properties, Inc., which the Trustee believes was owned and controlled by the Debtor and/or was the Debtor's alter ego.

34.     The Trustee also believes the gas station operating at the Property as of 2016 was owned or controlled by the Debtor and managed by Syed.

35.     The Debtor, however, had ultimate management and control of the gas station.

36.     In December 2016, the Debtor split ownership of the Property and the Business into two separate entities.

37.     On or about December 14, 2016, the Debtor formed the OpCo as an Illinois corporation to operate the gas station located at the Property. The OpCo is the entity that would come to own the Gaming License.

38.     At formation, the Debtor owned 100% of the shares of the OpCo.

39.     After the establishment of the OpCo, the gas station was controlled and managed by Debtor, with the day-to-assistance of Syed, the Debtor's longtime agent and employee.

40.     Also on December 14, 2016, the same day the Debtor formed the OpCo, the Debtor formed the PropCo as an Illinois LLC.

41.     At formation, the Debtor owned 15%, Hussein Munasser owned 17.5%, Nabil Hussein owned 17.5%, Defendant Nasr Ali owned 35%, and Ali Musa owned 15% of the PropCo.

42.     On information and belief, the individuals identified in the preceding paragraph were confederates of the Debtor and did not provide any consideration to the Debtor or AHM Properties, Inc. for their interest in the PropCo.

43.     Other than the Debtor, the individuals identified in paragraph 41 did not exercise genuine control over the PropCo.

44.     On December 23, 2016, AHM Properties, Inc. conveyed the Property to the PropCo.

45.     Several facts regarding the OpCo and the PropCo indicate that the Debtor did not intend these entities to exercise genuine control or authority over the Business or the Property and that both were alter egos of the Debtor from inception:

a. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that the OpCo was capitalized at formation.

b. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that assets were transferred to the OpCo at its formation, either formally via an asset sale agreement or otherwise.

c. The gas station continued to operate without change. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced any documents to show, for example, that supply contracts, business licenses, and the like were amended or updated to reflect that the OpCo now owned the gas station business and would assume the liabilities of any prior operators.

d. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the has not been able to substantiate that $2,500,000 was paid to AHM Properties, Inc. by the purported owners of the PropCo.

e. Neither the OpCo nor the PropCo kept even minimal corporate records and neither respected the corporate form.

f. The Debtor continued to control and manage the gas station as the Property as his personal property, through his longtime employee Syed.

**C.    The Spyropoulos Trust filed suit to enforce the note.**

46.    On March 28, 2017, the Spyropoulos Trust filed suit against the debtor in the Circuit Court of Cook County, seeking to collect on the note.

**D.    Soon after the court in the note action denied summary judgment, the OpCo obtained the Gaming License.**

47.    In March 2019, the Debtor explored the possibility of refinancing the Property.

48.    On March 22, 2019, the court in the note action filed by the Spyropoulos Trust denied summary judgment, making it likely that the case would go to trial.

49.    On April 18, 2019, the Illinois Gaming Board issued the Gaming License to the OpCo.

50.    The OpCo hired a third-party vendor, Accel Entertainment Gaming, LLC ("Accel"), to provide video poker machines and collect revenue.

51.     Accel operated machines, gathered funds, and gave the OpCo its share of video poker profits.

52.     After entering the relationship with Accel, the OpCo began conducting video poker operations on the Property.

53.     The OpCo immediately began realizing substantial profits from gaming operations, which generally increased from year to year.

54.     The OpCo's video poker operations now generate approximately $400,000-$500,000 in profits annually.

55.     The Illinois Gaming Board regards video poker licenses as running with the retail establishment. That is, when an establishment with a video poker license is sold to a new owner, the Illinois Gaming Board regularly reissues the license in the name of the new owner, provided that the new owner is not disqualified from holding a license.

**E.      Around the same time that the Spyropoulos Trust won a substantial judgment against the Debtor, the Debtor—through his alter egos—began a series of transactions designed to maintain control of the gas station and the Property while hindering, delaying, and defrauding creditors by making it appear that others owned the business and the Property.**

**1.      The Trust won a judgment.**

56.     In November and December 2019, the note case went to trial.

57.     On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor in the amount of $11,082,995.50.

**2.      The transfers of the OpCo and the Business**

**a.      The Debtor purportedly transferred his shares in the OpCo to Defendant Homsi.**

58.     Around November 2019, the Debtor purportedly transferred 100% of the shares of the OpCo to his wife, Defendant Homsi.

59.     There was no written agreement, board action, share certificates, or shareholder vote under which the shares were transferred from the Debtor to Defendant Homsi.

60.     As far as the Trustee has been able to discover, the only document reflecting the Debtor-to-Homsi transaction is an unsigned K-1 that was to be attached to the OpCo's 2019 tax return.

61.     Defendant Homsi did not pay any consideration for the shares of the OpCo.

62.     The license paperwork for the Gaming License (which discloses the name of the owner of the licensee) was not changed after the entirety of the stock in the OpCo was purportedly conveyed to Defendant Homsi.

63.     Defendant Homsi did not play any role in the operation or management of the OpCo after the purported transfer.

64.     The gas station continued to operate without change. The Debtor continued to manage the gas station through his longtime employee, Syed.

65.     On December 20, 2019, the OpCo signed a 10-year lease with the PropCo.

66.     Pursuant to the lease, the OpCo agreed to the pay the PropCo monthly rent of $17,500.00, plus additional monthly rent in an "amount which is the equivalent of the monthly revenue of the Lessee for the ATM commissions and Video Gaming." The base rent was to increase by $500.00 each year after that.

**b.      Homsi purportedly transferred her interest in the OpCo to Defendant Badr Ali.**

67.     At trial in Adversary No. 23-393 (discussed below), Syed testified that around January 2020, Defendant Badr Ali walked into the gas station without prior contact and told Syed that he wanted to buy the Business.

68.     Defendant Badr Ali did not have experience in the gas station business.

69.     Defendant Badr Ali did not request any documents about the gas station, the OpCo, its arrangement with the PropCo or the Debtor.

70.     Defendant Badr Ali did not conduct any diligence.

71.     In or about late 2019 or early 2020, Defendant Homsi purportedly transferred 85% of the shares of the OpCo to Defendant Badr Ali for $60,000, to be paid not as cash but over the next two years as wage payments from the OpCo.

72.     Defendant Badr Ali did not immediately pay any cash consideration for the shares of the OpCo.

73.     There was no written agreement, board action, share certificates, or shareholder vote under which shares were transferred from Defendant Homsi to Defendant Badr Ali.

74.     The supposed transaction was completely oral.

75.     In response to numerous Rule 2004 subpoenas issued by the Trustee, the only document produced that reflects the Homsi-to-Badr Ali transaction is the K-1 attached to the OpCo's 2020 tax return.

76.     Defendant Badr Ali did not control the operation or management of the OpCo after the purported transfer.

77.     It appears that the Business continued to operate without change. The Debtor continued to manage the Business through his longtime employee, Syed.

78.     The licensee paperwork (which discloses the owner of the licensee) with the Illinois Gaming Board was not changed to Defendant Badr Ali after the purported transfer of 85% of the shares of the OpCo to Defendant Badr. Instead, the licensee paperwork continued to show the Debtor as the owner of the licensee.

79.     On May 26, 2020, the OpCo signed a new lease with the PropCo.

Case 25-00168    Doc 1    Filed 05/23/25    Entered 05/23/25 17:21:30    Desc Main
Document    Page 11 of 30

80.    The new lease purported to change the base rent to $12,500 for June 2020, $15,000 for July 2020, $17,500 from August 1, 2020 to May 31, 2022, and $18,000 from June 1, 2022 to May 31, 2023. Each subsequent year rent rises by $500. The additional rent obligation is equal to the amount of the income derived from the gaming license was deleted.

81.    The lease was signed by Defendant Homsi, Walid Ali, and Ammar Alesayi. It was not signed by Defendant Badr Ali, even though there is a signature line for him.

82.    The second lease was never performed.

83.    The parties acted as if it had not been signed and instead continued under the first lease.

**c.    Ownership of the OpCo is transferred in December 2021.**

84.    On December 3, 2021, the OpCo executed an agreement to sell 100% of its shares to Defendant Calumet Fuel—an entity controlled by Defendant Nasr Ali—for a purported price of $400,000 (or less than the annual profit generated by gaming operations).

85.    $400,000 was not a reasonable value for the OpCo or the Business.

86.    Defendant Nasr Ali signed as president of Defendant Calumet Fuel, and Defendant Badr Ali signed as president of the OpCo and Defendant Homsi as its secretary.

87.    Under the sale agreement, Defendant Calumet Fuel supposedly obtained the gas station's inventory and the Gaming License.

88.    Defendant Nasr Ali's testimony in the trial of Adversary No. 23-393 indicates that the Debtor and Defendant Nasr Ali regarded the Gaming License as transferable property.

89.    In May 2023, the Debtor filed this chapter 7 case.

**d.    In February 2025, Calumet Fuel apparently transferred the business operations to Defendant AJ 119th.**

90.    On information and belief, on or about February 15, 2024, Defendant Calumet Fuel

transferred the operations of the Business to Defendant AJ 119th, which has occupied the Property

under a lease with Defendant Calumet Mobil (which, as described below purportedly acquired the

Property) and began conducting the gaming operations.

91.     On March 21, 2025, Defendant AJ 119th applied for a gaming license for the Property.

92.     To conceal the transfer, Calumet Fuel's purported owner, Nasr Ali, falsely testified

on March 26, 2025 at the trial in Adversary No. 23-393 that Calumet Fuel continued to operate the

Business and receive the revenues from the gaming license:

```
10      Q    And since 20- -- January of 2022, has your
11   company continued to operate the gas station, operate
12   the gaming machines, and receive the revenues that
13   are generated from the State of Illinois from
14   operating the gaming machines, correct?
15      A    Correct.
```

**3.      The transfers of the Property.**

93.     In 2019, the Debtor acquired the aggregate 50% of the PropCo that was owned by

Munasser, Hussein, Musa, and all but 5% of Defendant Nasr Ali's 35% interest in the PropCo. As

a result, at the end of 2019, the Debtor owned 95% of the PropCo and Defendant Nasr Ali owned

5% of the PropCo.

94.     Neither the Debtor nor any Rule 2004 subpoena respondent has produced a written

agreement documenting this transaction or evidence of consideration paid to Munasser, Hussein,

Musa and Defendant Nasr Ali for these interests.

95.     As far as the Trustee is aware, the only documentation of the transfers is the K-1

attached to the PropCo's 2019 tax return.

**a.      In 2022, the Debtor caused the PropCo to transfer the Property to PIP.**

96.      In late 2021, the Debtor decided to sell the Property to an entity controlled by Defendant Nasr Ali.

97.      The contemplated transaction was to be partially funded by a mortgage loan from Ameris Bank.

98.      On October 5, 2021, in connection with the planned sale, Ameris Bank obtained an appraiser, who appraisal valuing the Property alone at $9,600,000.

99.      Based on the Gaming License alone, however, the value of the Property is significantly higher than $9,600,000.

100.      On or about May 2, 2021, the PropCo agreed to sell the Property to Defendant PIP for $5.5 million.

101.      On January 27, 2022, Defendant Calumet Fuel and the PropCo executed an addendum to the sale agreement for the Property.

102.      The addendum stated that out of $5.5 million sales price, $400,000 would be apportioned to the gas station Business and the rest to the PropCo.

103.      The Debtor signed the addendum, even though he supposedly had given away the Business at that point.

104.      On January 31, 2022, at the same time as the sale of the shares of the OpCo, the PropCo sold the Property to Defendant PIP for $5,500,000, or $4,100,000 less than its appraised value.

105.      $400,000 of the proceeds of the sale were purportedly diverted to the OpCo under the sale agreement with Defendant Calumet Fuel.

106.      Not only were the transactions interrelated because of the addendum, Defendant

Nasr Ali admitted in testimony in the trial in Adversary No. 23-393 that he regarded the two trans-

actions as a singular transaction.

107.    To conceal the fraudulent transfer of the Property and Business from the Trustee,

on June 9, 2023, the Debtor's counsel sent a letter to the Trustee trying to explain that certain

transactions were not fraudulent, including the transfer of the OpCo's stock to Defendant Calumet

Fuel and the Property to PIP.

108.    In the letter, the Debtor's counsel cited an appraisal from July 2019 in the amount

of $5,535,000 of the Property, plus furniture, fixtures, and equipment, and failed to disclose that

the Property had been appraised for $9,600,000 a few months before the January 2022 transactions.

> **b.    In February 2025, PIP subsequently transferred the Property to Calu-
> met Mobil.**

109.    In December 2023, the Spyropoulos Trust filed a petition seeking denial of dis-

charge, which was filed as an adversary action in this case under Adversary No. 23-393. The gra-

vamen of the Spyropoulos Trust's complaint was that the Debtor was attempting to fraudulently

conceal assets—namely the Property and its associated business—from creditors to frustrate col-

lection of the judgment in the note case.

110.    On September 25, 2024, this Court entered an order in Adversary No. 23-393 di-

recting the parties to provide final exhibit lists by March 3, 2025 and setting the final pretrial

conference for March 12, 2025.

111.    On February 14, 2025, as the Debtor and the Spyropoulos Trust were preparing for

trial of Adversary No. 23-393, Defendant PIP purported to sell the Property to Defendant Calumet

Mobil.

112.    On February 14, 2025, Defendant PIP purported to transfer the Property to Defend-

ant Calumet Mobil for $6,500,000.00 plus a $5,000,000.00 mortgage loan from Defendant Nasr

Ali (the owner of the seller in the transaction).

113.    The purported sale occurred "as is" and Calumet Mobil has produced documents indicating no inspections of the Property were done before the purported transfer.

114.    Defendant PIP did not receive reasonably equivalent value for the Property.

115.    Defendant PIP was insolvent at the time of the transfer of the Property or rendered insolvent because of the transfer of the Property.

116.    The Spyropoulos Trust filed its exhibit list in Adversary No. 23-393 on February 21, 2025.

117.    The Court held the final pretrial conference in Adversary No. 23-393 on March 11, 2025.

118.    PIP and Calumet Mobil waited until March 12, 2025 (the day after the final pretrial conference and only 14 days before the trial) to record the sale documents with the Cook County Recorder of Deeds.

119.    On information and belief, the recording was delayed with the purpose of hindering, delaying, and defrauding the Debtor's creditors.

## COUNT I

### Declaratory Judgment
### (Against all Defendants)

120.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

121.    Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th were and are straw purchasers possessing mere naked title to the Business while the Debtor continues to exercise powers and responsibilities associated with the Business.

122.     Defendants Nasr Ali, PIP, and Calumet Mobil were and are straw owners possessing mere naked title to the Property while the Debtor continues to exercise power and responsibilities associates with the Property.

123.     Under Illinois law when a title holder holds title to property for the benefit of someone else, the title holder holds such property in a resulting trust.

124.     Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th operate the Business solely for the Debtor's benefit.

125.     Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th did not pay fair value for the Business.

126.     Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th advanced no or minimal funds for the Business in comparison to its value.

127.     Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th's intent was to hold legal title to the Business, while the Debtor continues to retain all equitable interests.

128.     Defendants Nasr Ali, PIP, and Calumet Mobil hold the Property solely for the Debtor's benefit.

129.     Defendants Nasr Ali, PIP, and Calumet Mobil did not pay fair value for the Property (or a share of ownership of the PropCo).

130.     Defendants Nasr Ali, PIP, and Calumet Mobil's intent was and is to hold legal title to the Property, while the Debtor continues to retain all equitable interests.

131.     On the Petition Date, the Debtor had equitable interests in the Business and the Property that allowed him to make decisions and receive distributions.

132.     Under Section 541 of the Bankruptcy Code, the Business and the Property are property of the Estate.

WHEREFORE, the Trustee requests that the Court enter a judgment declaring that Defend-ants' interests in the Business and the Property always have been and are property of the Estate under Section 541 of the Bankruptcy Code.

## COUNT II

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Homsi)

133.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

134.    In purportedly conveying shares in the OpCo to Homsi through AHM Properties, the Debtor acted with actual intent to hinder, delay, or defraud his creditors. This allegation is supported by the facts that:

    a.   the transfer was to his wife (badge 1);

    b.   the Debtor retained complete control of the gas station (badge 2);

    c.   the transaction was not documented or, apparently, disclosed to the Illinois Gaming Board (badge 3);

    d.   the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

    e.   the gas station (and proceeds of the gas station) was the only asset the OpCo owned (badge 5);

    f.   the Debtor was clearly aware of the danger of a veil-piercing action by his creditors because he transferred the OpCo to his wife so that it could be conveyed to third parties (badge 7);

    g.   the Debtor obtained nothing for the transfer (badge 8); and

    h.   the Debtor made the purported transfer around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

135.    Therefore, any transfer of shares of the OpCo to Homsi was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C.

§ 544, and the Trustee may recover, for the benefit of the Estate, the amount of the transfers if they are avoided under 740 ILCS 160/5 and 11 U.S.C. § 544.

WHEREFORE, the Trustee requests that the Court avoid the transfer to Homsi and enter judgment in his favor for the value of the transfer against Homsi, plus interest and other amounts allowable.

## COUNT III

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Homsi)

136.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

137.    Homsi did not provide the Debtor's alter ego,  AHM Properties, with reasonably equivalent (or any) value in exchange for shares of the OpCo.

138.    The Debtor was insolvent at the time of the transfer or became insolvent because of the transfer.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Homsi and enter judgment in his favor for the value of the transfer against Homsi, plus interest and other amounts allowable.

## COUNT IV

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. § 544(b)
### (Against Badr Ali)

139.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

140.    At all relevant times, the OpCo was the alter ego of the Debtor, meaning that any conveyance of shares in the OpCo from Homsi to Badr Ali was the conveyance of property directly

from the Debtor.

141.    In the alternative, the transfer of shares in the OpCo from the Debtor to Homsi and from Homsi to Badr Ali did not happen—as a factual matter, under the Business Corporation Act, 802 ILCS 5/, and/or under the Statute of Frauds, 820 ILCS 5/2-201. In all cases, the Debtor remained the owner of 100% of shares in the OpCo.

142.    In all events, in purportedly conveying shares in the OpCo to Badr Ali, the Debtor and/or Homsi acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

    a.  the Debtor retained complete control of the gas station (badge 2);

    b.  the transaction was not documented or, apparently, disclosed to the Illinois Gaming Board (badge 3);

    c.  the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

    d.  the gas station (and proceeds of the gas station) was the only asset the OpCo owned (badge 5);

    e.  the Debtor and Homsi were clearly aware of the danger of a veil-piercing action by his creditors because they transferred the OpCo to third parties (badge 7);

    f.  Homsi obtained almost nothing for the transfer in comparison to the value of the gaming license alone (badge 8);

    g.  the Debtor and, on information and belief, Homsi were insolvent at the time of the transaction (badge 9); and

    h.  the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

143.    Therefore, any transfer to Badr Ali was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

144.    In the alternative, Badr Ali is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because he took the shares from the initial transferee (Homsi) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Badr Ali and enter judgment in his favor for the value of the transfer against Badr Ali, plus interest and other amounts allowable.

## COUNT V

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Badr Ali)

145.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

146.    Badr Ali did not provide the Debtor's alter ego with reasonably equivalent value in exchange for shares of the OpCo.

147.    Both the Debtor and Homsi were insolvent at the time of the transfer or became insolvent because of the transfer.

148.    Badr Ali is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because he took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Homsi and enter judgment in his favor for the value of the transfer against Badr Ali, plus interest and other amounts allowable.

## COUNT VI

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Calumet Fuel)

149.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

150.    At all relevant times, the OpCo was the alter ego of the Debtor, meaning that any conveyances of shares in the OpCo from Homsi to Badr Ali and from Badr Ali to Calumet Fuel was the transfer of property directly from the Debtor.

151.    In the alternative, the transfers of shares in the OpCo from the Debtor to Homsi and from Homsi to Badr Ali did not happen—as a factual matter, under the Business Corporation Act, 802 ILCS 5/, and/or under the Statute of Frauds, 820 ILCS 5/2-201. In all cases, the Debtor remained the owner of 100% of shares in the OpCo until the transfer to Calumet Fuel.

152.    In all events, in purportedly conveying shares in the OpCo to Badr Ali, the Debtor and/or Homsi acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

   a.   the Debtor retained complete control of the gas station (badge 2);

   b.   the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

   c.   the gas station business was the only asset owned by the OpCo (badge 5);

   d.   the Debtor and Homsi and, on information and belief, Badr Ali were aware of the danger of a veil-piercing action by his creditors because they transferred the OpCo to third parties (badge 7);

   e.   Badr Ali obtained very little for the transfer in comparison to the value of the gaming license alone (badge 8);

   f.   the Debtor, Homsi, and, on information and belief, Badr Ali were insolvent at the time of the transaction (badge 9); and

g. the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

153.     Therefore, any transfer to Calumet Fuel was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

154.     In the alternative, Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the shares from an initial transferee (Badr Ali) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Calumet Fuel and enter judgment in his favor for the value of the transfer against Calumet Fuel, plus interest and other amounts allowable.

## COUNT VII

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Calumet Fuel)

155.     The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

156.     Calumet Fuel did not provide the Debtor and/or Badr Ali with reasonably equivalent value in exchange for shares of the OpCo.

157.     Both the Debtor and, on information and belief, Badr Ali, were insolvent at the time of the transfer or became insolvent because of the transfer.

158.     Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took from the initial transferee with knowledge that the transaction was

fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Calumet Fuel and enter judgment in his favor for the value of the transfer against Calumet Fuel, plus interest and other amounts allowable.

## COUNT VIII

**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544**
**(Against AJ 119th)**

159.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

160.    On information and belief, at all relevant times, Calumet Fuel was the nominee of the Debtor, meaning that any conveyances of the Business operated at the Property or possession of the Property to AJ 119th was the transfer of property directly from the Debtor.

161.    In all events, in transferring the business to AJ 119th, the Debtor and/or Calumet Fuel acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

> h.  the Debtor retained complete control of the gas station (badge 2);
>
> i.  the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);
>
> j.  the Business was the only asset owned by the Calumet Fuel (badge 5);
>
> k.  the Debtor and, on information and belief, Calumet Fuel were aware of the danger of an action by the Debtor's creditors because they transferred the Business to a third party (badge 7);
>
> l.  Calumet Fuel, which was operating under a lease, appears to have obtained nothing for the transfer (badge 8);
>
> m.  the Debtor and, on information and belief, Calumet Fuel, were insolvent at the time of the transaction (badge 9); and

n. the purported transfer occurred around the time that Adversary No. 23-393 was about to go to trial (badge 10).

162.   Therefore, any transfer to AJ 119th was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

163.   In the alternative, AJ 119th is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the shares from an initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of the Business or possession of the Property to AJ 119th and enter judgment in his favor for the value of the transfer against AJ 119th, plus interest and other amounts allowable.

## COUNT IX

### Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against AJ 119th)

164.   The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

165.   AJ 119th did not provide the Debtor and/or Calumet Fuel with reasonably equivalent value in exchange for the Business or possession of the Property.

166.   Both the Debtor and, on information and belief, Calumet Fuel, were insolvent at the time of the transfer or became insolvent because of the transfer.

167.   AJ 119th is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of the Business or possession of the Property to AJ 119th and enter judgment in his favor for the value of the transfer against AJ 119th, plus interest and other amounts allowable.

**COUNT X**

**Avoidance of Actual Fraudulent Transfers Pursuant to
740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
(Against PIP)**

168.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

169.    At all relevant times, the PropCo was the alter ego of the Debtor, meaning that any conveyance of the Property from the PropCo to PIP was directly from the Debtor.

170.    In all events, in conveying the Property to PIP, the PropCo acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

  a.  the transfer was to an insider (PIP was owned by Nasr Ali, who was a part owner of the PropCo) (badge 1)

  b.  the Debtor retained complete control of the gas station (badge 2);

  c.  the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

  d.  the Property was the only asset that the PropCo owned (badge 5);

  e.  the Debtor and by extension the PropCo were clearly aware of the danger of a veil-piercing action by his creditors because they transferred the Property to a related third party (Nasr Ali's company) (badge 7);

  f.  PIP paid millions less than fair value for the Property (badge 8);

  g.  the PropCo was insolvent at the time of the transaction or became insolvent because of the transaction (badge 9); and

  h.  the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

171.    Therefore, any transfer to PIP was an avoidable transfer within the meaning of 740

ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

172.    PIP is also liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid the transfer of the Property to PIP and enter judgment in his favor for the value of the transfer against PIP, plus interest and other amounts allowable.

## COUNT XI

### Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against PIP)

173.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

174.    PIP did not provide the PropCo with reasonably equivalent value in exchange for the Property.

175.    The PropCo was insolvent at the time of the transfer or became insolvent because of the transfer.

176.    PIP is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid any transfer to PIP and enter judgment in his favor for the value of the transfer, plus interest and other amounts allowable.

## COUNT XII

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Calumet Mobil)

177.   The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

178.   At all relevant times, PIP was a nominee of the Debtor, meaning that any conveyance of the Property from PIP to Calumet Mobil was the transfer of property directly from the Debtor.

179.   In all events, in conveying the Property to Calumet Mobil, PIP with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

> i.   the Debtor retained complete control of the gas station (badge 2);
>
> j.   the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);
>
> k.   on information and belief, the Property was the only substantial asset that PIP owned (badge 5);
>
> l.   the Debtor and by extension PIP were clearly aware of the danger of an action by the Debtor's creditors because they transferred the Property to a third party (badge 7);
>
> m.   Calumet Mobil paid millions less than fair value for the Property (badge 8);
>
> n.   PIP was insolvent at the time of the transaction or became insolvent because of the transaction (badge 9); and
>
> o.   the purported transfer occurred around the time that Adversary No. 23-393 went to trial, where Defendant Nasr Ali (PIP's owner) testified as a witness (badge 10).

180.   Therefore, any transfer to Calumet Mobil was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

181.   Calumet Mobil is also liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (PIP) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid the transfer of the Property to Calumet Mobil and enter judgment in his favor for the value of the transfer against PIP, plus interest and other amounts allowable.

## COUNT XIII

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Calumet Mobil)

182.   The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

183.   Calumet Mobil did not provide PIP with reasonably equivalent value in exchange for the Property.

184.   PIP was insolvent at the time of the transfer or became insolvent because of the transfer.

185.   Calumet Mobil is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (PIP) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Calumet Mobil and enter judgment in his favor for the value of the transfer, plus interest and other amounts allowable.

## COUNT XIV

### Aiding and Abetting Fraudulent Transfer
### (Against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan)

186.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

187.    Homsi, Badr Ali, Nasr Ali, Ahmad Zahdan, and Ajomon Joy knowingly aided and abetted the Debtor, Badr Ali, Calumet Fuel, and AJ 119th in fraudulently transferring shares of the OpCo and/or the Business or possession of the Property from the Debtor and/or Badr Ali to Calumet Fuel and/or AJ 119th.

188.    Nasr Ali and Ahmad Zahdan knowingly aided and abetted the Debtor, PIP, and Calumet Mobil in fraudulently transferring the Property to PIP and/or Calumet Mobil.

WHEREFORE, the Trustee requests that the Court enter judgment in his favor against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan in an amount to be proven at trial, plus interest and other amounts allowable.

Dated: May 23, 2025

GUS A. PALOIAN, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By:     */s/ Jonathan M. Cyrluk*
        Jonathan M. Cyrluk

*Counsel to Chapter 7 Trustee Gus A. Paloian*

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck*
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

*\*Admitted Pro hac vice*